**Geraldine BLYTHER, Appellant,**

v.

**CHESAPEAKE & POTOMAC TELEPHONE COMPANY, Appellee.**

**No. 93–CV–1433.**

District of Columbia Court of Appeals.

Submitted April 13, 1995.

Decided July 17, 1995.

Gary Christian and Kenneth Shepherd, were on the brief, for appellant.

William D. Nussbaum, with whom Karen M. Hardwick and Jonathan S. Franklin, were on the brief, for appellee.

Before SCHWELB and RUIZ, Associate Judges, and NEWMAN, Senior Judge.

Concurring opinion by Associate Judge RUIZ at p. 658.

PER CURIAM:

Geraldine Blyther appeals from an order granting summary judgment in favor of Chesapeake and Potomac Telephone Company (C & P) in an action for personal injuries. The pertinent facts and history of the case are detailed in the trial judge's orders of February 2, 1993 and October 15, 1993 and summarized in the concurring opinion of Judge Ruiz.

Substantially for the reasons stated by the judge in his order of October 15, 1993, as described by Judge Ruiz, we conclude that Ms. Blyther's substantive contentions are without merit. Moreover, even if summary judgment had been denied, the amendments to the contract on which the judge's October 15, 1993 order was substantially based would have been receivable in evidence at trial, and would plainly have required that a verdict be directed in C & P's favor. To require the case to go to trial would thus be futile, and "[t]he law does not require the doing of a futile act." *Ohio v. Roberts*, 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980); *see also In re Melton*, 597 A.2d 892, 908 (D.C.1991) (en banc). Accordingly, we affirm the judgment on appeal without reaching various issues addressed by our concurring colleague, at least one of which is by no means a simple one.[1]

*Affirmed.*

RUIZ, Associate Judge, concurring in the judgment:

I agree that on the facts of this case, summary judgment was both procedurally and substantively proper. Before we may

---

1. In light of our disposition of the appeal on other grounds, we explicitly decline to decide whether Ms. Blyther preserved her patently unpersuasive contention based on the doctrine of the law of the case when she raised it for the first time in her motion for reconsideration in the trial court.

consider the merits of this case, however, we must address a preliminary procedural point concerning the law of the case doctrine not previously decided by this court. I do not join the majority's slender yet sweeping reasoning because I believe it could be read to overrule our previous decisions regarding law of the case. Therefore, I write separately to explain the procedural issues impliedly and necessarily decided in the *per curiam* opinion and to argue for a narrow reading of the opinion, limited to the precise issue concerning law of the case presented in this case, consistent with our established case law.

## I.

Following are the facts and procedural history necessary to understand the case. On October 16, 1990, appellant, Geraldine Blyther, a custodial worker for the United States Senate, walked into a "wire closet" in the Dirksen building to get cleaning supplies. She stepped into a hole in the floor where a removable panel should have been. The principal purpose of the wire closet was to provide access to telecommunications equipment, particularly wire and cable interconnections. Due to a space shortage it was also used by the Senate to store custodial supplies.

Apparently two types of telecommunications interconnections were accessible through the closet: wire terminals, which were above the floor, and cables, which were below the floor. Appellee Chesapeake & Potomac Telephone Co. (or its affiliate, Bell Atlanticom Systems) was the contractor that had installed the cable and wire terminals. It had a continuing contractual obligation to maintain the wire terminals above the floor, but not the cables below the floor.

Presumably barred from recovering from her employer more than workers' compensation for her injuries, Blyther sued C & P. Discovery showed conclusively that whoever removed the missing floor tile was not an employee of C & P. Discovery also showed that many other persons were authorized to enter the wire closet, including those with business that would involve removing the floor tile. Discovery further revealed that the wire closet was left unlocked at all times pursuant to an informal agreement between custodial workers and the Senate, which controlled access to the wire closet. C & P consequently moved for summary judgment.

The trial court denied the motion for summary judgment, suggesting, *sua sponte*, that C & P may have violated a duty under the Industrial Safety Act, D.C.Code § 36–221 to –232 (1993), to furnish appellant a safe place of employment. Thereafter, the litigation apparently focused on whether C & P had control of the wire closet—a necessary element of liability under the Industrial Safety Act—with particular attention given to the terms of C & P's contract.

C & P twice renewed its motion for summary judgment, contending that the record showed that C & P did not have control over the wire closet. The second renewal came just four days before the date of trial and was premised upon C & P's allegedly newly discovered evidence in the form of an amendment to the contract between C & P and the Senate requiring the latter to inspect C & P's work for compliance with "ind[u]stry standards" prior to acceptance. On the day of trial, the court heard oral argument on the renewed motion and granted summary judgment, concluding that the contract amendments showed C & P did not have control over the wire closet. Within the time permitted by Super.Ct.Civ.R. 59(e), Blyther sought reconsideration on the grounds that (i) the motion was decided before ten days had elapsed, (ii) the order was contrary to the law of the case, (iii) there was no authority for reconsideration,[1] and (iv) the contract amendment was ambiguous on its face. The trial court denied the motion. Blyther filed a timely notice of appeal.[2]

---

1. This claim appears to have been abandoned on appeal.

2. As a preliminary jurisdictional matter, I observe that the notice of appeal names as the order appealed the "Motion [sic] Denying Plaintiff's Motion for Reconsideration of Court's granting C & P's Motion for Reconsideration Based On Newly Discovered Evidence." D.C.App.R. 3(a) requires that the notice of appeal "designate the ... order ... from which appeal is taken." This court has, however, held that a

On appeal, Blyther renews her first two procedural arguments and contends that the grant of summary judgment was substantively erroneous because the contract was ambiguous concerning the issue of control. C & P disputes the assigned errors and additionally argues that the procedural issues were waived by Blyther's failure to raise them in a timely manner. C & P also contends that the judgment should be affirmed on the alternative ground that the Industrial Safety Act did not impose any duty on C & P to furnish Blyther with a safe working place.

## II.

Before reaching the merits, the procedural objections posed by Blyther must be addressed. Followed to its logical conclusion, the majority's justification for avoiding the procedural issues in this case implies abolition of the law of the case doctrine in all cases. Thus, I believe it exceeds the authority of this panel. Consideration of Blyther's specific procedural arguments convinces me that the trial court committed no error in revisiting and granting C & P's motion for summary judgment on the day of trial.

## A.

The majority does not address Blyther's argument based on law of the case. Although it comments that it is "patently unpersuasive," it does not explain why. The decision is based on the maxim: "The law does not require the doing of a futile act." In this case, the "futile act" is denial of summary judgment, requiring a trial, only to have a directed verdict.[3] I believe this truncated reasoning does not stand up to scrutiny.

Under the majority's "futile act" approach, law of the case would never prevent a trial judge from overruling a prior denial of summary judgment on the eve of trial. In fact, if a trial to take place in a few hours would be a "futile act," so too would a trial scheduled in a few days or months or years be such a "futile act"—so long as summary judgment were otherwise proper. The majority's ruling essentially states the proposition that the law of the case doctrine has no application to denials of summary judgment. Yet we have on several occasions held the opposite. *Kaplan v. Pointer*, 501 A.2d 1269, 1270 (D.C. 1985); *Kurth v. Dobricky*, 487 A.2d 220, 224–25 (D.C.1985).

Whatever force the majority's reasoning has, moreover, does not stop with decisions denying summary judgment. Any erroneous decision by a trial court entails the doing of work that is unnecessary, and therefore "futile," because the error either will prolong or

notice of appeal designating only an order denying reconsideration is sufficient to include consideration of the underlying order "where ... it is clear from the face of the Notice of Appeal that appellant was seeking review of the underlying judgment dismissing her claim as well as the denial of the Motion for Reconsideration." *Perry v. Sera*, 623 A.2d 1210, 1215 (D.C.1993); *see also Chapman v. Norwind*, 653 A.2d 383, 386 (D.C. 1995). The notice of appeal in the present case specifies in its statement of issues more than merely those issues raised in the motion for reconsideration and attacks the grant of summary judgment generally. Thus, this court has jurisdiction to review the order granting summary judgment as well as the order denying reconsideration.

3. The majority states that had the contract amendment been received in evidence, it would have required a directed verdict in favor of C & P. The statement implies that the earlier denial of summary judgment would not be law of the case with respect to the identical legal question of sufficiency of the evidence to support a jury's verdict. I am concerned with that statement because the amendment was not particularly relevant to the question of control of the wire closet and because I question whether it was new evidence. In other words, I do not believe that the contract amendment was "material new evidence," *see infra* note 6 and Section III. Thus, I see no reason (other than the one explained in B.3 below) why law of the case would not bar a directed verdict contrary to an earlier denial of summary judgment. The majority does not cite any authority for its proposition and I am not aware of any decision of this court so holding.

In this connection, I observe that if the earlier denial of summary judgment were law of the case with respect to a motion for directed verdict and even a motion for judgment after the verdict, then the doctrine would give the prevailing party the significant advantage of having a judgment pending appeal. That advantage would give the party moving for summary judgment a similarly significant incentive to make its first try at a dispositive motion its best try, thus serving the goal of efficiency underlying the law of the case doctrine.

complicate proceedings in the trial court or else will require remand after an appeal to correct the error. Under the majority's approach, the possibility of "futile" [4] work would always justify a departure from the law of the case doctrine. Thus, the majority's reliance on its maxim strikes at the very roots of the doctrine. The policies of efficiency and avoidance of judge-shopping that the doctrine is supposed to further are supplanted, under the majority's futility approach, by reliance on hindsight.

Regardless of the doctrine's merits, however, it is firmly entrenched in the decisions of this court. Therefore, its settled application is not open to revision or repudiation by this panel. Internal Operating Procedures of the District of Columbia Court of Appeals ¶ VIII.G (Nov.1991). By addressing the specific procedural questions raised by Blyther (and not addressed by the majority), including whether the law of the case doctrine precluded the judge from reconsidering his prior denial of summary judgment in this case, I arrive at the same result reached by the majority, but without undermining our previous holdings on law of the case.

### B.

Blyther contends that the judge was precluded from granting summary judgment by the doctrine of law of case, in light of the judge's earlier decisions denying summary

judgment.[5] C & P counters that Blyther waived the law of the case issue by failing to raise it during the impromptu hearing held on the day of trial, that the law of the case doctrine does not apply by virtue of the allegedly newly-discovered evidence, and that the doctrine does not apply to bar a judge from reconsidering his own earlier order. I address each contention in turn.

### 1.

C & P contends, and the trial judge ruled, that Blyther waived her law of the case argument by failing to raise it during the hearing on the motion for summary judgment. We recently held that this court will not address an argument premised on law of the case when it had not been raised in the trial court. *Sherman v. District of Columbia,* 653 A.2d 866, 869 (D.C.1995). In the present case, Blyther did make the argument in the trial court, albeit in a motion for reconsideration, filed thirteen calendar days after summary judgment had been granted. I think that in the present case, that was sufficient to preserve the question for review. The rule against deciding questions not "'properly raised and preserved'" in the trial court "'reflect[s], not obeisance to ritual, but considerations of fairness to the court and the parties and of the public interest in bringing litigation to an end after fair opportunity has been afforded to present all issues of law and fact.'" *District of Columbia v.*

---

4. I also disagree that the trial court's work is properly termed "futile." It can only become unnecessary in retrospect, after the merits of the interlocutory order causing the work have been decided on appeal. Before appeal, however, whether the interlocutory order is in error is a question that is postponed.

5. Blyther also contends that the trial court erred by failing to afford her the full ten days provided for in Super.Ct.Civ.R. 56(c) to respond to C & P's motion. She relies principally on *Tompkins v. Washington Hosp. Ctr.,* 433 A.2d 1093, 1099 (D.C.1981), where we held that "the ten-day notice provision is mandatory, not discretionary, and trial judges are obliged to enforce the provision strictly unless it is waived." We also said in *Tompkins,* however, that, "[a]s a matter of common sense, of course, there may be times when a purely formal renewal of a motion for summary judgment does not require adherence to the ten-day notice provision." *Id.* at 1100 (footnote omitted).

This case presents such an instance. The issue presented by the motion—C & P's control of the wire closet—had been central to the litigation for a long period of time and had been the subject of an earlier motion for summary judgment. As noted in the discussion of the merits in section III, the "newly-discovered" evidence upon which C & P predicated its renewed motion was merely cumulative of other similar evidence already before the judge. In addition, because summary judgment was granted on the day of trial, Blyther should have been fully prepared to litigate the question as of that date. Unlike the situation in *Tompkins,* where the basis for a trial day summary judgment hearing was new, *id.* at 1097, Blyther did not contend that she needed time to obtain additional evidence or to develop additional arguments on the question of control. Thus, any failure to adhere to the ten-day requirement is not error.

*Wical Ltd. Partnership*, 630 A.2d 174, 182 (D.C.1993) (quoting *Miller v. Avirom*, 127 U.S.App.D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967)). The parties addressed the question of law of the case in the trial court and the trial court had an opportunity to consider their arguments.

Under the circumstances of this case, Blyther's assertion of law of the case in a timely Rule 59(e) motion for reconsideration was sufficient to "properly" raise the question. Although Blyther should have been, and apparently was, fully prepared to argue the merits of her control claim that were at the heart of the merits of the summary judgment motion, *see supra* note 5, she did not have any time to prepare procedural arguments addressed to a motion she need not have anticipated arguing. She raised the law of the case issue as soon as she could, in the trial court, after the granting of summary judgment. Thus, the law of the case question is properly before this court.

**2.**

We have long held that the law of the case doctrine bars a trial court from reconsidering a motion presented to and decided by a court of coordinate jurisdiction when (i) the new motion is substantially the same as the earlier one; (ii) the decision on the earlier motion is sufficiently final; and (iii) the prior ruling is not clearly erroneous in light of new evidence or a change in substantive law. *E.g., Tompkins, supra* note 5, 433 A.2d at 1098. All three elements of the law of the case doctrine are present here: C & P's motion was virtually identical to its earlier motion for summary judgment. We have held that denial of a motion for summary judgment is sufficiently final for purposes of law of the case. *Kaplan*, 501 A.2d at 1270; *Kurth, supra*, 487 A.2d at 224–25. As more fully discussed in section III, *see infra* note 11, the motion did not present any material new evidence [6] or a change in substantive law.

**3.**

This court has not decided whether the law of the case doctrine applies to prevent a

judge from reconsidering his or her own prior order. *Williams v. Mount Jezreel Baptist Church*, 589 A.2d 901, 907 (D.C.), *cert. denied*, 502 U.S. 865, 112 S.Ct. 190, 116 L.Ed.2d 151 (1991). With respect to courts of coordinate jurisdiction, we have observed that the doctrine "serves the judicial system's need to dispose of cases efficiently by discouraging 'judge-shopping' and multiple attempts to prevail on a single question." *Tompkins, supra* note 6, 433 A.2d at 1098. In the single-judge situation, the concern of judge-shopping is, of course, not present. *Williams, supra*, 589 A.2d at 907.

We have also noted the doctrine's general concern for efficiency. That concern, although present in the single-judge situation, *id.*, is less significant, given that the judge is presumably already familiar with the evidence and law material to the issue and, unless the judge has doubts as to the soundness of his or her prior decision, may summarily reject a party's attempts to upset a prior decision without the expenditure of substantial judicial resources.

On the other hand, the judge may have occasion to rethink a prior interlocutory decision in light of both what came before and the stimulus of reading a decision not previously brought to the judge's attention or coming across a similar problem in a different context in another case. "Judges are constantly reexamining their prior rulings in a case on the basis of new information or argument, or just fresh thoughts...." *Johnson v. Burken*, 930 F.2d 1202, 1207 (7th Cir.1991). It is both appropriate and ultimately efficient to permit the judge to act upon such new thoughts, in that it is likely to yield a more accurate result earlier than would be permitted as the result of an appeal. "No one will suggest that [a] judge himself may not change his mind and overrule his own order...." *Dictograph Prods. Co. v. Sonotone Corp.*, 230 F.2d 131, 134 (2d Cir.1956) (Hand, J.). Therefore, I would hold that the law of the case doctrine is no

---

6. Moreover, the additional evidence that C & P did present was culled from records of an affiliate that C & P obtained apparently without the use of judicial process. Thus, it is questionable whether that material was not available to C & P at the time of its earlier motion.

bar to a judge revising or reversing his or her own decisions.

## III.

I now turn to my reasons for affirming in substance the trial court's grant of summary judgment, which we review *de novo*. Whatever duty C & P may have owed to Blyther under the ISA is necessarily tied to its "control or custody" of the wire closet which Blyther had to enter in the course of her employment. *See* D.C.Code § 36–222(1) & (4) (1993) (defining a covered "employer" in terms of control of a place of employment). If C & P did not have control or custody of the wire closet at the time of Blyther's injury, it could not have owed her any duty to take steps to prevent that injury.[7] The parties appear to agree that if C & P is to be deemed to have control over the wire closet, such control must be derived from the contract between C & P and the Senate.

The contract does not support the conclusion that the Senate conferred on C & P any control over the physical arrangement of the wire closets.[8] The wire closets appear to have been the dividing line between the respective responsibilities of the Senate and C & P to maintain portions of the telecommunications system.[9]

In the contract, the Senate undertook to furnish safe working conditions that complied with applicable regulations.[10] The only reasonable conclusion is that it was the Senate that could control those conditions, not C & P. Other provisions of the contract cited by the parties clearly refer to the equipment in the wire closets, not the closet themselves, as the responsibility of C & P.[11]

The provisions cited by Blyther concerning safety measures to be undertaken by C & P are quoted out of context. Paragraph E.13.1 introduces the paragraphs outlining appropriate safety measures to be undertaken by C & P. It provides:

*In performing this contract,* the Contractors shall provide for protecting the lives and health of employees and other persons; preventing damage to property, ma-

7. Because I conclude that C & P lacked the requisite control, there is no need to address C & P's alternative arguments concerning the availability, applicability and validity of the ISA under the facts of this case.

8. Paragraph F.11.1 of the contract provided that existing wire closets be used. In fact, according to paragraph E.6.2, the Senate was generally responsible for providing space for the equipment to be installed by C & P and, according to paragraph E.6.2.2, C & P was responsible for "investigat[ing] the site and determin[ing] that it is of acceptable character and quality for the installation and operation of the equipment." The contract did not assign to C & P any other responsibility with regard to the spaces where the equipment would be installed.

9. Pursuant to paragraph F.14.1, C & P was responsible for maintaining the network-oriented equipment and the connections from that equipment to the terminals in the wire closets. Paragraph F.14.3 assigned to the Senate maintenance responsibilities for the telephone sets and other station equipment and the cable connections up to the wire closets. Thus, no control or custody of the wire closet may be inferred from the duties assigned to C & P under the contract.

10. Paragraph D.34 of the contract provided:
The contractors shall, without additional expense to the Senate, be responsible for obtaining any necessary licenses, permits and tariffs,

and for complying with any Federal, State and municipal laws, codes and regulations, and the orders of any relevant administrative bodies, applicable to the performance of the work or provision of the services hereunder, *except, however, the Senate will be responsible for providing Contractors' employees with working conditions conforming to applicable employment, safety and health statutes and regulations for work performed on Senate premises.*
(emphasis added).

11. For example, the full provision in C & P's touted "newly discovered evidence" reads as follows:
6. SYSTEM ACCEPTANCE: The Senate will initiate a *system acceptance test* on the following basis:
6.1 Wire closets: The Senate will inspect all wire closets for conformance to industry standards and provide a written report to C & P of any noted deficiencies within 14 days of the completion of conversions. C & P will repair or correct all noted deficiencies within 14 days receipt of the report.
(emphasis added).
From the introductory language referring to *system acceptance,* it appears that the C & P installation the Senate was to inspect was directed not toward the physical conditions in the closets, but instead toward the elements of the telecommunications system contained in the closet.

terials, supplies and equipment; and avoiding work interruptions. For these purposes, the Contractors shall:

(emphasis added).

In light of that provision, the safety clauses relied upon by Blyther are inapposite. There is *no* dispute that the hole that Blyther stepped into was not created by C & P while it was "performing th[e] contract." At the time of Blyther's injury, it is undisputed that C & P was responsible only for the equipment above the floor, not below the floor. Thus, paragraph E.13.1 has no applicability to this case.

In short, the contract is unambiguous in leaving control of the wire closet where it started—with the Senate. Therefore, even assuming the ISA could impose a duty on C & P with respect to the employee of another, it *did not do so* under these facts with respect to Blyther because C & P did not have the requisite "control or custody" over the closet in which the injury took place.